UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ZIMMER, INC. and ZIMMER
SPINE, INC.,

          Plaintiffs,

vs.

PAMELA ALBRING,

          Defendants.

_____/

Case No. 08-CV-12484

HON. GEORGE CARAM STEEH

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiffs Zimmer Inc. and Zimmer Spine, Inc. (collectively Zimmer) allege that its former sales agent, plaintiff Patricia Albring, is communicating with its customers, soliciting their business, and conducting research related to competitors' products in violation of her non-compete, non-solicitation, and confidentiality agreements. Zimmer now seeks a preliminary injunction to prevent Albring from soliciting its customers, selling products to its customers, and disclosing any confidential information. Since this case is in its infancy and no discovery has taken place, the Court construes Zimmer's motion for a preliminary injunction as a motion for a temporary restraining order. The parties had notified the court that they had settled this lawsuit; however, plaintiff later contacted the court to report that Albring had new counsel, the settlement was off, and Albring would no longer sign the stipulated injunction. Albring has filed a response and a supplemental response and Zimmer has filed a reply brief which this Court has duly

considered. Because Zimmer has shown a substantial likelihood that Albring is violating her non-compete and non-solicitation agreements by engaging in a research project with one of her former customers, Zimmer's motion for a temporary restraining order shall be granted in part. Having failed to show, however, that her current employment for a competitor violates her confidentiality, non-compete and non-solicitation covenants, Albring remains free to continue in her current employment subject to certain restrictions.

## BACKGROUND

A.  The Parties

Defendant Pamela Albring was a highly compensated sales agent for Silver Surgical from May, 2002 until August, 2007. Zimmer is in the business of designing and manufacturing surgical implants and related equipment. Silver Surgical is the sales representative for Zimmer. While in the employ of Zimmer, Albring sold Zimmer products related to neurosurgery and orthopedic spinal surgery to surgeons and hospitals in Northwestern Ohio.

B.  The Agreement

Silver Surgical, Inc. solicits orders for Zimmer within a certain geographical area which includes Northwestern Ohio where Albring worked. Albring is a nurse who left nursing to work as a sales agent for Silver Surgical selling Zimmer products. On December 15, 2005 she signed a Sales Agent Independent Contractor Agreement. That agreement includes a provision governing confidentiality and covenants not to solicit customers and not to compete with Silver Surgical. Specifically, Paragraph 8 prohibits Albring from disclosing Zimmer's "Confidential Information." (Doc. 2, Exhibit A

2

at ¶ 8, p. 6-8). The agreement defines "Confidential Information" to include "marketing, sales and advertising information," "Customer information," "pricing policies," and "product specifications." (Doc. 2, Exhibit A at ¶ 8, p. 7). Paragraph 10 sets forth a covenant not to solicit customers. It provides in part:

> For a period of twelve (12) months, beginning on the later of the termination or expiration of Sales Agent's relationship with Company for any reason or the date on which Sales Agent begins to comply with this Section 10, Sales agent shall not, without the prior written consent of Company and Zimmer, either directly or indirectly, on Sales Agent's own behalf, or on behalf of any person, firm, corporation or other business or legal entity, solicit, attempt to solicit or engage in discussions or other communications with (regardless of who initiates such discussions or communications), any Restricted Customer (defined below) with the purpose or intent of promoting, selling or obtaining orders for any spinal implants or orthopedic devices or related medical products, services, instruments or supplies.

(Doc. 2, Exhibit A at ¶ 10, p. 8-9).

The agreement defines "Restricted Customers" as follows:

> A "Restricted Customer" is any person, firm, corporation or other business or legal entity which, during any part of the twelve (12) month period immediately preceding the effective date of the termination or expiration:
>
> > A. (1) was an actual Customer of Zimmer or other Companies represented by Company, (2) participated in or influenced the purchasing decisions of any actual Customer of Zimmer or other Companies represented by Company, or (3) used the Products purchased by any actual Customer of Zimmer or other Companies represented by Company; and
> >
> > B. was solicited or serviced directly or indirectly by Sales Agent or any person supervised or managed by Sales Agent.

(Doc. 2, Exhibit A at ¶ 10, p. 9).

The agreement also sets forth a covenant not to compete which provides:

> For a period of twelve (12) months, beginning on the later of the

3

> termination of Sales Agent's relationship with Company for any reason or the date on which Sales Agent begins to comply with this Section 12, Sales Agent shall not, without the prior written consent of Company, either directly or indirectly, on Sales Agent's own behalf or on behalf of any person, firm, corporation or other business or legal entity, provide services in the Territory for any Competitive Business. For purposes of this Agreement, a "Competitive Business" is a business, offering or selling products that are competitive with any of the Products or any other products that Sales Agent was promoting, marketing or soliciting orders for on behalf of Company at any time during the twenty four (24) months preceding the termination of this Agreement.

(Doc. 2, Exhibit A at ¶ 12, p.10). The Agreement also calls for injunctive relief in the case of a breach.

> In the event of a breach, the Agreement provides for injunctive relief: Sales Agent acknowledges that a breach of Section 8, 9, 10, 11 or 12 of this Agreement would cause irreparable harm to the business of Company and Zimmer, which may not be adequately compensated by money damages. Sales Agent therefore agrees that in the event of any actual, threatened, or imminent breach of Section 8, 9, 10, 11 or 12 of this Agreement, Company shall be entitled, in addition to any other remedies available to it, to a temporary restraining order and to preliminary and final injunctive relief prohibiting Sales Agent from violating this Agreement, with or without pursuing any potential damage remedies.

(Doc. 2, Exhibit A at ¶ 13, p. 10).

Although the Agreement was executed between Albring and Silver Surgical Supply, the Agreement explicitly states that Zimmer has an independent right to enforce it:

> The parties acknowledge and agree that Zimmer and its parents, affiliates, subsidiaries, successors and assigns are express third party beneficiaries of this Agreement with an independent right to enforce any of its provisions.

(Doc. 2, Exhibit A at ¶ 14, p. 10). The Agreement also calls for attorney fees in the case of a breach. (Doc. 2, Exhibit A at ¶ 16, p. 11). It also provides that it is to be governed by Michigan law. (Doc. 2, Exhibit A at ¶ 19, p. 11).

4

C. <u>Albring's Work</u>

Before becoming a sales representative, Albring worked as a nurse. From approximately 1985 to 2000, she worked as a surgical nurse in the operating room (OR) at the Toledo Hospital. (Doc. 2, Exhibit B at p. 5).[1] From 2000 to 2002, she worked as a nurse at Saint Vincent Hospital in Toledo. (Doc. 2, Exhibit B at p. 5). Albring worked for Silver Surgical from May, 2002 to August, 2007. As a first year sales representative, she earned about $100,000 but her salary quickly escalated to well over $300,000 a year. While working as a sales representative, Albring sold products to many of the same doctors that she knew from her time as a surgical nurse. Some of her main clients were neurosurgeons Dr. Brian Hoeflinger, Dr. Lawrence Spetka, Dr. Ahmad, and Dr. Zakeri who worked as a group at the Toledo Hospital. (Doc. 2, Exhibit B at p. 10-11). In her sworn testimony, Albring testified that she was good friends with Dr. Zakeri and Dr. Spetka (Doc. 2, Exhibit B at p. 53).

In August, 2007, Albring resigned from her sales position at Silver Surgical. As part of her sworn testimony, she said that she left Silver Surgical after losing some sales accounts and suffering a significant drop in her income which led to conflicts with her supervisor, Dave Furey. (Doc. 2, Exhibit B at p. 20-21, 29-30). During her exit interview, she said that she was leaving to help her husband run a greenhouse. Silver Surgical suspected that she was going to work for its competitor, Abbott Laboratories, Inc. (Abbott) but when asked, Albring denied it.

---

[1] Prior to filing this lawsuit, Zimmer's counsel interviewed Albring under oath with an attorney present, and a court reporter present much like a deposition. Zimmer relies on Albring's testimony (Doc. 2, Exhibit B) in support of its motion for a preliminary injunction.

5

D.   The Alleged Breach

Zimmer alleges that Albring is now working for Ohio Surgical Solutions, Inc. (Ohio Surgical) and Ohio Spine Network (Ohio Spine). These entities are distributors of Abbott medical devices. On November 11, 2007, Albring entered into a non-compete and non-solicitation agreement with Ohio Surgical and Ohio Spine. (Doc. 2, Exhibit C). Zimmer alleges that Albring has sold Abbott products to the doctors at Toledo Hospital that she used to service as a sales agent for Zimmer. Specifically, Zimmer alleges that at the time that Albring resigned, it lost its accounts with Dr. Hoeflinger, Dr. Spetka and Dr. Zakeri. Drs. Hoeflinger and Dr. Spetka are now using Abbott products. (Doc. 2, Exhibit B at p. 51-52). Zimmer has not shown per se that Albring sold Abbott products to these doctors, but there is an inference that may be drawn by the timing of their shift in product use. Dr. Hoeflinger, however, started using Abbott products at least six-months prior to Albring's resignation from Silver Surgical. Albring's counsel stated at oral argument that Dr. Hoeflinger started using Abbott products in March, 2007. At oral argument, Zimmer argued that it is still possible that Albring may have exerted some possible influence over Dr. Hoeflinger's switch to Abbott products because it is not known how long she was negotiating her employment with Ohio Surgical before she officially resigned from Silver Surgical in August, 2007. It is not disputed that Albring was expressing discontent with Silver Surgical and was experiencing conflict with her supervisor, Dave Furey, for some time before she tendered her resignation.

According to Albring's sworn testimony, she now is working twenty-hours a week for the Toledo Clinic as the research coordinator for Doctor Hoeflinger earning about $18 per hour. (Doc. 2, Exhibit B at p. 45-46). According to Albring's affidavit, Dr.

6

Hoeflinger invited her to work with him on the clinical study after he learned that she had left Silver Surgical. (Doc. 7, Declaration of Pamela Albring). As part of her research, she is in the OR when Dr. Hoeflinger has a cervical or a lumbar fusion case and she collects data regarding how the patients do during and after surgery, all of whom are receiving different Abbott products. (Doc. 2, Exhibit B at p. 49-51). She also testified that she is being paid by Ohio Surgical $3,000 per week to do nothing as the company is waiting for her non-compete agreement with Zimmer to run out and then she will begin selling Abbott products for them. (Doc. 2, Exhibit B at p. 46-48).

Albring was first hired by Ohio Surgical to sell a different product in the Cleveland area, outside the geographical and product scope of the non-compete agreement, but that arrangement fell by the wayside, when the product was not successful. (Doc. 7, Declaration of Albring, p. 3). Zimmer alleges that Albring's true reason for being present in the OR during Dr. Hoeflinger's surgeries is not to conduct research, but to sell Abbott products. According to Albring's response brief, when she worked for Silver Surgical, she also would be present in the operating room to oversee how the implants were used during surgery. This activity seems to suggest that Albring's research activities in the OR, overseeing Abbott products during surgery, would mirror the kind of work she had performed for Zimmer. Zimmer further alleges that Albring is preparing Dr. Hoeflinger and Dr. Spetka to use Abbott spinal implants.

Albring's research also involves studying patients who have received "Actifuse" which is a bone graft product. Zimmer alleges that the designer and manufacturer of

7

Actifuse, Affatech,[2] is a direct competitor of Zimmer and Silver Surgical.

Zimmer argues that Albring has breached the Zimmer Agreement by engaging in communications with the Toledo Hospital, Dr. Hoeflinger and Dr. Spetka with the purpose of promoting and selling spinal implants or orthopedic devices or related medical products on behalf of Ohio Surgical, Ohio Spine and Abbott.  Zimmer alleges that Albring's research involving Abbott and Affatech products constitutes a breach of her non-compete agreements.  In her supplemental brief, Albring appears to admit that her research work for Dr. Hoeflinger violates her non-compete agreement.  In that supplemental brief, Albring specifically states, "defendant suggests that the only allegation of a violation relates to one physician group in one hospital.  Defendant has scrupulously adhered to the Agreement in every other regard.  Accordingly, the Court should limit any relief to that physician group, Doctors Hoeflinger, Zakeri and Spetka."  Albring argues that Zimmer should be enjoined from injunctive relief because they have waited nearly six-months from learning of her alleged breach of the non-compete agreement.

## STANDARD OF LAW

In determining whether to issue a temporary restraining order or preliminary injunction, the court must consider four factors:(1) whether the movant has shown a strong or substantial likelihood of success on the merits, (2) whether irreparable harm will result without an injunction; (3) whether issuance of a preliminary injunction will result in substantial harm to others; and (4) whether the public interest is advanced by

---

[2]Zimmer refers to the company as Apatech.

the injunction. Abney v. Amgen, Inc., 443 F.3d 540, 547 (6th Cir. 2006) (citations omitted). These four considerations are "factors to be balanced, not prerequisites that must be met." Certified Restoration Dry Cleaning Network v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (citations omitted). The decision of whether or not to issue a preliminary injunction lies within the sound discretion of the district court and will not be overturned on appeal unless the court relies on clearly erroneous findings of fact, or when the court improperly applies the law. CSX Transp., Inc. v. Tennessee State Bd. of Equalization, 964 F.2d 548, 553 (6th Cir. 1992).

A plaintiff must always show irreparable harm before a preliminary injunction may issue. Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 104 (6th Cir. 1982). "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Sampson v. Murray, 415 U.S. 61, 88 (1974) (citations omitted). The primary purpose of a preliminary injunction is to maintain the status quo until a decision on the merits can be made. University of Texas v. Camenisch, 451 U.S. 390, 395 (1981). The court is to be flexible in its consideration with each leg of the test balanced against and among the others. In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985). For example, a district court, in its discretion, may grant a preliminary injunction "even where the plaintiff fails to show a strong or substantial likelihood of success on the merits." Friendship Materials, 679 F.2d at 105. In such a case, a plaintiff must show, at a minimum, "serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued. Id. A district court abuses its discretion, however, when it grants a preliminary injunction without making specific findings of irreparable

injury to the party seeking the injunction. Id.

ANALYSIS

Before considering the four factors discussed above, the Court first considers Albring's argument that Zimmer has waived its claim of injunctive relief. Albring argues the waiver occurred because Zimmer delayed six-months from learning of Albring's alleged breach to file its Complaint and motion for injunctive relief. Zimmer, however, disputes that it knew of an alleged breach as early as December, 2007. Zimmer also points out that the statute of limitations for a breach of contract action is six-years. MCL § 600.5807. Finally, Zimmer quotes to the parties' agreement which expressly provides that "the failure of Company to enforce any provision of this Agreement against Sales Agent . . . shall not be construed as a waiver of any such provision, nor prevent Company from thereafter enforcing such provision or any other provision of this Agreement." (Doc. 1, Exhibit A at ¶ 14, p.10). Based on the express language of the contract, it is quite clear that Zimmer has not waived its right to seek injunctive relief.

1. Likelihood of Success on the Merits

Zimmer argues that it is likely to succeed on the merits because its non-solicitation, non-compete and confidentiality agreements are reasonable in "duration, geographical area, and the type of employment or line of business." MCL § 445.774a(1). The non-compete, non-solicitation clauses of the Agreement are limited to one-year, involve Albring's specific customers and territory in Northwestern Ohio. Zimmer also argues that Albring has violated the confidentiality clause which is in effect indefinitely.

Zimmer argues that courts have enforced confidentiality agreements that are

open-ended. See Superior Consultant Co., Inc. v. Bailey, 2000 WL 1279161 at *9 (E.D. Mich. Aug. 22, 2000); Robert Half Int'l v. Van Steenis, 784 F. Supp. 1263 (E.D. Mich. 1991). Although some courts have enforced confidentiality agreements of indefinite duration, the court does not find such enforcement to be available in this case. Zimmer has not shown or even alleged any trade secrets involving the surgical implants and the identity of Albring's customers, namely Drs. Hoeflinger, Spetka and Zakeri, were well known to Albring before she began work with Zimmer. In fact, she considers Drs. Spetka and Zakeri to be her friends. In any event, their identity is easily accessible and can be located merely by checking the telephone book. Thus, this Court limits its discussion of Albring's alleged breach of her employment agreement to the non-solicitation and non-compete covenants.

Zimmer argues that Albring has admitted to violating the Agreement because she has admitted she is being paid $3,000 per week ($156,000 per year) by Ohio Surgical and Ohio Spine. This is not dispositive of the question. Albring testified that Ohio Surgical and Ohio Spine are paying her in anticipation of when she can begin to work for them, which will not take place until her non-solicitation and non-compete covenants with Zimmer expire. At oral argument, plaintiff's counsel conceded this arrangement does not appear to violate the agreement which prevents Albring only from "provid[ing] services" to her former customers. (Doc. 2, Exhibit A at ¶ 12, p. 10). Her research, however, involving the Abbott study presents a different question. The non-solicitation agreement is very broadly drafted and prevents even "discussions or communications" with former customers, which would include Dr. Hoeflinger, with the purpose of "promoting, selling or obtaining orders for any spinal implants or orthopedic devices."

11

(Doc. 2, Exhibit A at ¶ 10 at p. 8-9).  There is no question that Albring has repeated discussions with Dr. Hoeflinger regarding Abbott products during her research.  Whether or not these discussions can be tied to Albring's alleged intent to sell Abbott products is less clear, but the fact remains that she is receiving $3,000 a week from Abbott while participating in the Abbott study.

Although it is a close question as to whether Albring is violating the non-solicitation covenant, it appears quite likely that she is violating the non-compete agreement.  Again, that covenant is very broadly drafted and prohibits her from "provid[ing] services" to any competitive business within the geographical area.  (Doc. 2, Exhibit A at ¶ 12, p.10).  Her research for Dr. Hoeflinger - to measure the efficacy of Abbott products - is properly viewed as a service to Abbott.  While Albring denies selling any Abbott products to Dr. Hoeflinger, it is undisputed that he is now using Abbott products as is his partner, Dr. Spetka.

Albring's employer on the research is the Toledo Clinic, but at oral argument, both parties agreed that Abbott itself is likely funding the studies.  There are two studies at issue: one covers the cervical spine, the other - the lumbar spine.  As part of the studies, Albring is assisting Dr. Hoeflinger in measuring the efficacy of Abbott products.  One purpose of the study appears to be for Dr. Hoeflinger to decide whether or not to use the Abbott products.  Albring argues that the study is neutral and points to the fact that the project is being carried out under the auspices of the Institutional Review Board at The Toledo Hospital.  She maintains that it is possible the studies will report negatively on the Abbott products, in which case, Dr. Hoeflinger arguably would cease using the products.  Zimmer, on the other hand, argued at oral argument that the study

is dubious, it is solely for the doctor's benefit, and is tailored to sell Abbott products. For Albring to assist in the research venture while on the payroll of Ohio Surgical and Ohio Spine, who are undisputably in the business of selling Abbott products, appears to this court to violate her non-solicitation and non-compete agreements. Zimmer also argues that Albring's presence in the OR is designed to help Dr. Hoeflinger and Dr. Spetka prepare to use Abbott spinal implants and related medical devices. This argument finds support in the fact that Albring was present in the OR when she worked for Silver Surgical to help them to use Zimmer products. At a minimum, the study ensures that during the period it takes place the participating doctors will be purchasing Abbott products. Although the facts here are disputed, it does appear that Zimmer has shown a "substantial likelihood of success on the merits" as to Albring's alleged breach of the non-solicitation and non-compete agreements arising out of the research project.

The court now turns to the question of whether Zimmer is likely to prevail on its claim that Albring's employment status with Ohio Surgical and Ohio Spine violates her non-solicitation and non-compete covenants. Although Ohio Surgical and Ohio Spine have employed her to work as a sales agent, it is with the understanding that her non-solicitation and non-compete agreements bar her from selling or providing services in relation to Abbott products in Northeast Ohio for one-year. Albring is obviously a valued asset for a company in the business of selling surgical implants and related medical devices. This should come as no surprise to Zimmer when she was being paid as much as $380,000 as a sales representative for Silver Surgical. The fact that Ohio Surgical and Ohio Spine are paying Albring for the opportunity to employ her when her one-year non-compete agreement expires does not translate into a finding that she is selling

13

Abbott devices now. Albring promises great potential as a seller of surgical implants which may well derive from her background as an R.N. and the independent relationships she has with certain doctors that have been her friends for years, and long before she ever sold Zimmer products. Where Zimmer has failed to show that Albring is using Zimmer's confidential information, the mere fact that she is now in the employ of Ohio Surgical and Ohio Spine does not support the granting of injunctive relief. This Court will narrowly tailor the temporary restraining order so as not to bar Albring from her current employment relationship with Ohio Surgical and Ohio Spine by which she is being paid to wait until her non-compete agreement and non-solicitation run out.

Zimmer also argues that it is likely to prevail on its tortious interference with business relations claim. In order to prove such a claim, Zimmer must prove four elements: (1) the existence of a valid relationship, (2) knowledge of the relationship, (3) intentional interference inducing a breach or termination of the relationship, and (4) damages. <u>Health Call v. Atrium Home & Health Care Servs.</u>, 268 Mich. App. 83, 89-90 (2005). As to the first two prongs, there is no dispute that they are met. Zimmer argues that Albring knew of and furthered its relationships with Dr. Hoeflinger, Dr. Spetka and Dr. Zakeri and that she has now interfered with those relationships so that Zimmer has lost their business. Zimmer has presented only circumstantial evidence that Albring might have interfered with those relationships. True, she ceased being Zimmer's sales representative, but this standing alone is not "intentional interference." While Dr. Zakeri no longer uses Zimmer products, he does not use Abbott products either. The fact that these doctors ceased using Zimmer products when Albring stopped being Zimmer's sales representatives does not mean that she necessarily interfered with Zimmer's

relationships with those doctors. It may just mean that she was a great sales person and that once she was out of the picture, the neurosurgeons decided to purchase their medical devices elsewhere. On the other hand, there is no getting around the fact that these doctors are now using Abbott products while Abbott's distributors, Ohio Surgical and Ohio Spine, are her employers. In the case of Dr. Hoeflinger, however, the evidence shows that he was already using some of Abbott's product even before Albring left Zimmer's employ. Based on the factual record now before the court, it is possible that Zimmer might prevail on its tortious interference claim, but it is unclear if this result is "likely."

2.  Irreparable Harm

The next factor that the court considers is whether Zimmer would suffer irreparable harm if Albring were not enjoined from working as a researcher for the Toledo Clinic or from being paid by Ohio Surgical and Ohio Spine. Zimmer is correct that courts have found that the breach of non-compete agreements can give rise to irreparable harm. The "loss of consumer goodwill and the weakened ability to fairly compete that would result from disclosure of trade secrets and the breach of a no-compete agreement does establish irreparable injury." Lowry Computers Prod. Inc. v. Head, 984 F. Supp. 1111, 1116 (E.D. Mich. 1997). Judge Cohn has noted that the "[l]oss of customer goodwill and fair competition can support a finding of irreparable harm. Such losses often amount to irreparable injury because the resulting damages are difficult to calculate." Superior Consulting Co., Inc. v. Walling, 851 F. Supp. 839, 847 (E.D. Mich. 1994). Zimmer argues that it faces irreparable harm if Albring continues to harm its goodwill, its customer relationships, and its ability to compete.

15

Zimmer also argues that Albring is using its confidential information to its detriment. As discussed earlier in this opinion, this Court does not find that Albring is using any confidential information of Zimmer learned during her employment with Silver Surgical. Nevertheless, Zimmer has made a strong showing of irreparable harm if the temporary restraining order is not granted if Albring is allowed to continue her work on Dr. Hoeflinger's Abbott research project.

The evidence shows that Albring is in the OR with Dr. Hoeflinger during his surgeries involving Abbott products. This is similar to her role when she worked for Silver Surgical and she would be in the OR making sure that the nurses and technicians understood how the Zimmer products worked. (Doc. 7 at 6-7). Albring's access and proximity to Dr. Hoeflinger on the research assignment, combined with his switch to Abbott products, raises a serious question of fact as to whether Albring has violated her non-solicitation and non-compete agreements. If such a breach has in fact occurred, Zimmer has shown that it has been irreparably harmed because Albring will continue to violate the restrictive provisions and it will lose its goodwill, customer relationships, and ability to compete. The Court finds this argument persuasive. Zimmer has shown that it will be irreparably harmed without injunctive relief preventing Albring from the research project. Since Zimmer has not shown, however, a substantial likelihood that plaintiff's ability to collect compensation from Ohio Surgical and Ohio Spine violates her non-compete agreement, Zimmer is not entitled to injunctive relief in this regard. The TRO will allow Albring to continue collecting compensation from Ohio Surgery and Ohio Spine.

### 3. Substantial Harm to Others

The balance of the harms weighs in favor of Zimmer. Albring argues that she would be harmed by the entry of a TRO as she is in the process of a divorce and she is in dire need of her income for support. The Court appreciates Albring's valid argument that she should remain free to support herself and accordingly will be careful in drafting this TRO to balance all of the competing interests at work. The Court will bar Albring from working as a researcher at the Toledo Clinic where her involvement with Abbott products suggests that Zimmer is very likely to establish a violation of her non-solicitation and non-compete agreements. The Court will not bar Albring, however, from receiving compensation from Ohio Surgical and Ohio Spine as she waits for the duration of her non-compete agreement to run out. Zimmer has not demonstrated any breach of her non-compete or non-solicitation agreement caused by this arrangement. Of course, Albring also remains free to use her R.N. degree in any manner that does not violate her non-compete and non-solicitation agreement with Silver Surgical.

Albring also argues that the research project will suffer if the TRO is issued as there is a shortage of nurses and it would be difficult to find a suitable part-time replacement to bring onto the project mid-stream. While the hospital may face some difficulty finding a replacement for Albring, this inconvenience is outweighed by the harm to Zimmer's goodwill and competitive advantage if the injunction is not entered.

### 4. Public Interest

Although the public also has an interest in allowing individuals the right to work and to change jobs, the public also has an interest is seeing that valid contracts are enforced. In this case, Zimmer has shown that it is likely to prevail on its claim that

Albring has violated her non-compete and confidentiality agreements via her work as a researcher for Dr. Hoeflinger.  As such, the public interest that is at stake here is protecting the public's interest in enforcing valid contracts.

CONCLUSION

Having found that Zimmer is likely to prevail on its claim that Albring's research activities violate her non-solicitation and non-compete covenants, Zimmer's motion for a TRO (Doc. 2) hereby is GRANTED IN PART as follows: effective July 5, 2008, Albring hereby is enjoined from working as a "research coordinator" at the Toledo Hospital and the Toledo Clinic to the extent that her work involves any Abbott or Affatech product. This prohibition bars Albring from performing any work in the OR while Dr. Hoeflinger performs surgeries using Abbott or Affatech products.  Albring is further enjoined from any solicitation, discussion or communication with Drs. Hoeflinger, Zakeri and Spetka with the intent of promoting, selling or obtaining orders for any spinal implants or orthopedic devices manufactured by Abbott or Affatech.  Albring is further enjoined from providing any services to Abbott or Affatech involving Drs. Hoeflinger, Zakeri and Spetka.

Because Zimmer has not shown a substantial likelihood of success on its claim that Albring's employment with Ohio Surgical and Ohio Spine amounts to a breach of her non-solicitation and non-compete covenants, Zimmer's motion for a TRO (Doc. 2) hereby is DENIED IN PART as follows: Albring is free to remain an employee of Ohio Surgical and Ohio Spine as long as she performs no services for Abbott or Affatech and otherwise abides by the non-solicitation and non-compete covenants of the Agreement (Doc. 2, Exhibit A).

The parties hereby are ORDERED to agree to a date for a preliminary injunction hearing in conjunction with the Court's case manager. This TRO remains in effect until the date of the preliminary injunction hearing.

SO ORDERED.

Dated: June 27, 2008

                                      s/George Caram Steeh
                                      GEORGE CARAM STEEH
                                      UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
June 27, 2008, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk

---